Hello, your honors. I'm Mr. Tree, James Tree, and I'm pleased today to represent Ms. Perez in this claim. As we talk about Ms. Perez's disability claim today, I would respectfully ask that the court keep in mind the uncontested testimony of Social Security's own vocational expert who vocational experts stated the Bureau of Labor Statistics has reported the average number of unscheduled absences after one year of employment range from 2.3 to 4.1 in a given year. Therefore, my opinion is an employer will tolerate approximately six unscheduled absences in a year and that anything more than that on an ongoing basis would likely lead to termination of employment. This is an uncontested fact in the case and one in which the ALJ did not disagree. The period of time that we're looking at here was from alleged onset date in March of 2016 through the and then the administrative law judge hearing was in December of 2017. During that time, those months, Ms. Perez had 24 urinary tract infections and these just weren't confined to her lower urinary tract. These were infections that went all the way up into her kidneys. She eventually had to have her left kidney removed and she continued to have right kidney infections in addition to these urinary tract infections. Is that connected? I have a question. Yes. Is that connected to the spina bifida? Are the urinary tract issues connected to the spina bifida or do we know that? She did have a separately neurogenic bladder. She had her bladder problem, she had her kidney problem, she had her spina bifida, she had her foot impairments. Many of these were congenital from birth. She had her first surgery when she was only seven months old and she had what the literature describes as the most serious form of spina bifida. But she did work for quite a while. Yes, she worked for 12 years. I think the amazing thing about this case is that Ms. Perez, even though she had multiple surgeries in her infancy and her formative years, she didn't give up. She had strong family support and she worked for 12 years full-time. Then she went to part-time work before the record shows that she was unable to work at all. She was asked at her hearing, did you apply for unemployment? Unemployment benefits in the state of Washington, a person needs to be able to work at least part-time. But she was unable to do so and so she was not eligible for unemployment because she couldn't even work part-time after over 12 years of fighting through these problems she had. During these periods of time from her onset date, March of 2016, until the time of the administrative law judge hearing, which is about a year and a half, she had five surgeries. These were several significant surgeries she had, including the removal of her uterus in May of 2016 and a vaginal prolapse surgery, the removal of her left kidney in December of 2016. For those surgeries, I mean if you looked at that time period you'd think, well for that time period she obviously couldn't work because she was having surgeries all the time. Is that relevant to the disability determination? Yes, very relevant, Your Honor, because if a person is unable to work for 12 continuous months, they're eligible for 12 continuous months but was big chunks of the 12 months, right? Right, and so if she during 12 month period, according to the vocational expert, if she missed six days of work she would be unable to work, I mean to sustain employment. So what did the ALJ say about that? I mean she obviously did miss more than six days of work during a 12 month period, much more. So why isn't she sort of disabled for that time period? I don't understand that. The judge was silent on that subject, didn't address it, just said that he felt like that she had improved by the time of the, he wrote his decision, he wrote his decision. Is that the period, I mean the period of time that she could be disabled, this is one thing I was curious about, she could be disabled for part of the time, not necessarily projected into the future, but at least for some time period. Yeah, it's not uncommon for an administrative law judge to, they call it a closed period of disability, where you approve a period for 12 months or 16 months or 18 months. And so certainly the judge erred in not determining if she was disabled for at least a period of 12 months, which would have granted her at least a closed period of disability. And then the question became, did her disability continue after that? And we believe the evidence strongly does show that it continued after that. So what specifically did the ALJ do wrong, aside from what we just were talking about? Yeah, so the ALJ did not consider whether she was disabled for even a 12 month period, that's one thing. And certainly she was, she was in the four days on another surgery. And for three months, I mean, he seemed to acknowledge that for three months for one of the surgeries she was disabled, but he said it was just three months. Right. There was one doctor that had said that she would be unable to walk at all. She would need to be in a wheelchair for three months after her surgery. And he commented on that, on that three months, but that was only for one of her conditions. Dr. Shively, one of the, I think, significant errors that the judge made was the rejection of Dr. Shively, who had treated her as a board certified urologist for 10 years. Dr. Shively gave a report that said that she would miss at least one day of work per month, which is twice what the vocational experts said was tolerated just from her urinary tract infections, because these were significant urinary tract infections because of her congenital problems that she had in her neurogenic bladder and her kidney problems. And so Dr. Shively said she would miss one day per month. Well, the ALJ only gave one reason to reject Dr. Shively, and that was because of a note at 790. And the ALJ used this over and over again in his decision, ER 790. It was a note that he took a sentence out of context, I believe, and he said, the judge said, Ms. Perez was non-toxic appearing and her appearance was with a urinary tract infection. She was put on Keflex, and they decided not to admit her the next day at the hospital because they didn't feel she had sepsis and her condition didn't warrant hospitalization. But she still had a urinary tract infection on the very day that the ALJ rejected Dr. Shively, the 10-year treating urologist, who said she would miss one day of work per month. What does non-toxic mean? What are you thinking? A person isn't toxic. If you touch them, there's something wrong with them. I don't know what a non-toxic person is. Yeah, I don't think it's really relevant to her urinary tract infection. She wasn't alleging any sepsis or toxicity that would require hospitalization, but certainly the lab results the day before had shown that she had a urinary tract infection and she had symptoms from that significant that she had to go to the emergency room and prior to that to urgent care and had to be put on antibiotics yet another time. She was chronically on antibiotics. What's interesting is that nine months after her kidney surgery, her treating physician, Dr. Burry, who treated all of her conditions, stated that she was having recurrent urinary tract infections. And so this didn't go away when she had her surgery to remove her kidney or to the surgery to remove urinary tract infections aren't necessarily disabled. A lot of people walk around with urinary tract infections. Exactly. A lot of people do, although Ms. Perez's were not ordinary urinary tract infections because of her neurogenic bladder. They would go up and they weren't lower urinary tract infections. They became upper and all the way up into her kidneys. And that's why Dr. Shively stated with her, she would miss work one day per month just from a urinary tract infection. Now, interestingly, though, Dr. Burry, when he said he looked at all of her because he was her primary care physician, he looked at all of her impairments, including her spina bifida, her urinary tract infections, her foot impairments. And he said she would miss four or more days of work per month due to the combination of all of her impairments. And that's it. The record at 462 and 463. And so every single treating provider, the ALJ rejected. Also, the ALJ rejected Social Security's own consultative examiner. Social Security sent Ms. Perez to their own doctor for an evaluation. That was Dr. Drangas. And Dr. Drangas said she can be on her feet for two out of eight hours. She can sit for four out of eight hours. Well, that's six out of eight hours. Social Security ruling 96-8P says a person must be able to work eight hours a day, five days a week, a 40 hour work schedule, or they're disabled. Social Security disability is based on a full work schedule, not a part-time work schedule. So even Social Security's own doctor. The examining doctor. There was this non-examining doctor who apparently the ALJ favored, Dr. Daly. He was a non-examining state agency medical consultant. And the ALJ used his testimony to say that it contradicted the treating physicians and the examining physicians and therefore they were entitled to little weight. Yeah, I found that troublesome because the reason that the ALJ gave to reject Dr. Drangas, the consultant examiner, was he had only seen her once. And so he said, I reject his opinion. Right. That was more than Dr. Staley. Right. So I found that troubling. He found that further, Dr. Staley did the evaluation early in the process before many of these records were in, before the opinions from the treating providers were in, before she'd had these surgeries, before the record was fully developed. This is at the initial stage where she applies and before it ever gets to the ALJ hearing. And then we wait a year for the ALJ hearing, long before all of that. Then the other thing that we believe is that on January 11th, 2018, Physicians Assistant PAC had provided a medical report that she would continue to miss work. This is at, this is after the hearing. The administrative law judge said he wouldn't accept it because he wasn't notified before the hearing. Well, the report wasn't available before the hearing because it wasn't even created until after the hearing. The hearing was in 2017, December. The report was created for the, on January 11th, 2018. And it was immediately sent to the ALJ. He didn't issue a decision until about five months later. It was a two-page report. This is a non-adversarial proceeding, the US Supreme Court said. And yet the judge says, I'm not going to consider that two-page report. But yet he rejected the doctors based upon an ALJ report from the same Physicians Assistant who had indicated on one particular day she was doing better. But yet after that, the same Physicians Assistant came forward and says, no, she would miss work, meaning she would be disabled under Social Security criteria. And the ALJ wouldn't even look at it and consider it. Says, no, he won't consider it because it wasn't given to him five days before the hearing when it didn't even, it didn't exist. So we think that's a significant error. And it also factually shows that she didn't improve to the point where she could return to work on a regular and continuous basis. Ms. Perez's was also, her credibility was questioned by the Administrative Law Judge because the objective evidence didn't support her allegations. Yet she had five surgeries, she had to have her kidney removed, she had to have her uterus removed, she had to have her prolapse surgery, she had to have two surgeries on her feet. And these, according to the doctors, didn't correct her problems. She continued to have problems after these. She had 10 additional infections after this, both of the surgeries were completed. She testified at her hearing, I have good and bad days. On my bad days, I'm in bed most all the day. Her doctor stated that she did need to lie down during the day on an average day, two to three hours. And she confirmed that on her good days, that's what was required. She said she had three to four bad days per month, where she was basically for the day bedridden. That's not inconsistent with any of her activities in daily living. She said she grocery shopped one day per week, which is consistent with the bad days that she had only three to four per month. But that would be disabling if she had those bad days three to four days per month. Her doctors and also Dr. Drangas, Social Security's doctor stated that she was cooperative, that he saw no inconsistencies on his physical examination. There's no evidence of an exaggeration or malingering in the medical records. She's been found to be a very credible person. Mr. Tree, how old was she? She was at the beginning of this period, she was in her 30s, Your Honor. Now she would be probably, I'm not sure exactly, but she was in her 30s. All right, I think you're well over your time. I apologize. No, it's not your fault. We were All right, so is Mr. Phillips there? Yes, Your Honor. Can you hear me? Are you by phone? I am. All right. Yes, we can hear you. I have a question. Why are you by phone? It's only government lawyers who appear by phone, and I don't understand. Oh, I chose to appear by phone because I felt like I had enough stress already and I'm not so good with technology, and I was worried that doing the video, it sounded like it was a little bit more of an involved process. So I just wanted to keep it as simple as possible. It's just that it's only United States government lawyers who appear by phone, and I raised this many times, and I don't seem to get anywhere. Anyway, go ahead. Okay, please record. I'm Jacob Phillips appearing on behalf of the Commissioner of Social Security. Good morning, Your Honors. This is a case where... Counsel, listen up. Can you hear me? I can. It's faint. I'm going to turn up my volume, but yes, I can hear you. Please do, because my first comment is I believe that the claimant is now 54 years. Counsel, my question to you is, after looking at the briefs, all the reports that were made or turned down, do you have any serious question in your mind that this claimant not seriously incapacitated? Your Honor, I think that there is no doubt in this case that this claimant had severe impairments and that she was substantially limited in her ability to do work, and the ALJ's decision supports that. The ALJ limited her to a reduced... Counsel, wait a minute. Don't get ahead of yourself. She has serious problems. I know her counsel has said a couple of times that he's troubled by it, and I can tell you I'm more than troubled. Do you understand what the standard review is for the ALJ in regard to this matter? I believe he's turned down four treating positions. Can you state to me what the standard review is for the ALJ to make those determinations when he refuses to file one? Well, under this court's precedent, the ALJ needs to provide specific and legitimate reasons when discounting a treating... Is it clear and convincing? Your Honor, when there is a conflict in opinions, the standard is specific and legitimate. So in this case, there are numerous conflicts among the opinions. For instance, as Mr. Tree pointed out, Dr. Shively opined that Ms. Perez would need to miss only one day of work a month, whereas a different provider opined that she would need to miss four days. But that's only a conflict between whether she's disabled or more disabled. I'm sorry, that's only a conflict between what? Disabled or more disabled. Because in both instances, she'd be disabled. Well, there are conflicts in the opinions, and so the ALJ needs to resolve these conflicts. You don't have any one opinion... Excuse me a minute. You didn't need to resolve that one. You could assume the lesser one, and you'd still be disabled. So that doesn't help. So what is there that... And does it not matter at all... Well, the ALJ is tasked with reviewing the record as a whole. And so I think what's important to consider in this case is that all of these opinions that were rendered, they were rendered before treatment. So you've got Dr. Shively, who gave his opinion in October 2016, but then he performed a nephrectomy to remove an unhealthy kidney in December 2016. And you've got evidence showing that she doesn't appear for treatment again for a serious UTI condition until July 2017. So his opinion that she was going to... Why isn't she at least disabled for that year? She's in the hospital for... And for three months, she can't walk and so on. Why isn't she at least disabled for a year? Well, when the ALJ looks at the decisions, the standard is whether the impairments will cause disabling limitations for a continuous period of 12 months. And so when you're who may have serious conditions, but they receive treatment for the conditions, you don't consider that... Say somebody has a serious back condition and they have to miss a week of work, but after they get that treatment, they're able to function after that. And as Mr. Tree pointed out, the VE testified that six unscheduled absences a year would be disabling. Employers wouldn't tolerate that. But that doesn't mean that any individual who receives some serious treatment during the course of a year is then disabled. That's not the standard under the Social Security Act. They have to show that their impairments caused disabling symptoms for a period of 12 continuous months. And in this case, we just don't have that. We've got Ms. Perez saying in October that she has a zero out of 10 pain in her back. And in December 2016, she again denied back pain. And this is all before she received her detethering back procedure in March 2017. And even at that point, at her three-month post-op, she was walking. She was taking only ibuprofen at that point. And so, you know, and I would point out that Ms. Perez's own back surgeon was assigning fewer limitations from her back condition than other providers, which is another conflict. You've got Dr. Drury, who believes that, and again, I'm sorry, Dr. Drury offered her opinion before the back surgery and also before Perez's two foot surgeries, which again, those were outpatient procedures. And the evidence shows that she, just within weeks of those procedures, she was reporting relief. So, you know, I think that this is a case where it's really important to consider these opinions in the context of the record as a whole, as ALJ did, and to note that these opinions came in before she received the treatment that helped her conditions. What about the continuing UTIs after she had her condition? The, you know, I don't think the evidence showed that these would be, that these were disabling conditions. She, you know, Mr. Tree pointed out that she did, she did go to the emergency room that one time in July, 2017. Again, this is more than seven months after she received her kidney, her left kidney removal. And at that point, she went to urgent care one day and with a fever, and she was given some medication. And then she went back to the emergency room the next day because she still had a fever. And the doctors who looked at her at that point said, I think she was discharged within a couple hours. Her labs came back negative. She was stable. There weren't issues at that point. So, you know, again, looking at the record in the context as a whole, you're just not seeing the type of evidence that suggests that she was as limited as she claimed or as the case. And so I would like to address the issue of remedy before I sign off in this case. The, oh, I would also like to get to Mr. Tree's point about Ms. Thatch's 2018 opinion that was offered after the hearing in this case. I think it's important to look at that opinion and read when you read that opinion, it isn't really assessing limitations. It's basically saying that if she does work that causes her pain, then her condition will deteriorate. But, you know, what the LJ was tasked with doing here was trying to determine what type of work the evidence suggested Ms. Perez could do. And in this case, he formulated a residual functional capacity that was very limiting. He found she could do a reduced form of sedentary work. And so in that sense, it's consistent with this opinion because the LJ's, you know, trying to find a job where her conditions wouldn't deteriorate, that she wouldn't be cause pain. So he's not finding she can do light or medium work. He's finding she can do sedentary work. And so as for the issue of remedy in this case, opposing counsel is arguing that the proper remedy is to remand for an immediate finding disability. It's our position that this case is, there are conflicts in the record. And more importantly, when you look at the record as a whole and look at her functioning after her procedures, there is serious doubt as to whether Ms. Perez is disabled. She's very limited, but there's serious doubt as to whether she's disabled. So with that, yes. Let me ask a question to you. Do you agree that this court could remand with an order granting her disability? We can do that. Yes, I do. I do agree that if the court finds harmful error in the LJ's decision and finds that the conditions of the credit as true test are met and finds that overall the record as a whole does not create a serious doubt that the claimant is in fact disabled, then yes, the court can remand for an immediate finding. Thank you. Sure. But as our position is that the ALJ did not commit harmful error. And if there are no further questions, then I'll conclude by asking the court to affirm the district court's judgment. Thank you very much, counsel. Thank you. Mr. Tree, you went over, but I'll give you a minute. You're muted, Mr. Tree. Thank you, your honor. I would just like to very quickly say that I don't believe there's any conflict between Dr. Burry who said four or more days of work missed and Dr. Shively who said one day because Dr. Shively was saying it based only on the urinary tract infection and Dr. Burry was saying it on all of them. As pointed out in the briefing and in the medical records, throughout this entire period and even and after all the surgeries, Ms. Perez had a self-catheter every three to four hours. Imagine going into work at least twice during a work schedule, having to self-catheter. The breaks just don't allow that in that type of work environment. And she needed to have a clean environment. The records show she continued to have worsening after the surgeries of bladder that she started, that she didn't use to before the surgeries, wet her bed, but she did afterwards. And she wet herself after self-cathetering because it didn't completely empty her bladder. These are serious problems that would affect work activity in addition to all the other things we've talked about. Thank you very much. I appreciate your attention today. Thank you, counsel. Perez versus Saul is submitted. We previously submitted Garcia v. Wilkinson and we'll take up Buffen versus City and County of San Francisco.
judges: Baldock, Wardlaw, Berzon